UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

DAVID LILLEY,

    Plaintiff,

v

KEVIN EARLY, Ph.D., in his
individual capacity,

    Defendant.

Case No.
Hon.

| |
|---|
| James K. Fett (P39461)<br>Bryan E. Kontry (72361)<br>FETT & FIELDS, P.C.<br>805 E. Main<br>Pinckney, MI  48169<br>734-954-0100<br>734-954-0762-fax<br>jim@fettlaw.com<br>bryan@fettlaw.com<br>Attorneys for Plaintiff |

# PLAINTIFF'S COMPLAINT AND JURY DEMAND

Plaintiff David Lilley, through his counsel, Fett & Fields, P.C., states the following complaint against Defendant:

### JURISDICTION AND PARTIES

1.    This is an action for race discrimination and retaliation in violation of 42 USC § 1981 and 42 USC § 1983.

2. The jurisdiction of this Court is invoked pursuant to 28 USC §§ 1331, 1343(a)(3), and 1343(a)(4).

3. Jurisdiction to grant injunctive relief and declaratory equitable relief as well as money damages is invoked pursuant to 42 USC § 1983 and 29 USC § 626(c).

4. Plaintiff is a forty-six-year-old white male resident of Washtenaw County, Michigan; he holds a Ph.D. in criminal justice and, until May 2014, was a tenure track professor at the University of Michigan Dearborn ("Dearborn").

5. Defendant, African-American Kevin Early, is a resident of Oakland County.

6. Defendant Early, at all relevant times to this suit, was the Director of the Criminal Justice Department at Dearborn.

7. The events giving rise to this cause of action occurred in the Eastern District of Michigan.

8. The amount in controversy exceeds $75,000.00, exclusive of interest, costs and attorney fees.

## COMMON ALLEGATIONS

9. Dearborn hired Plaintiff in September 2008 as a tenure-track Assistant Professor in its Criminal Justice Program

10. Plaintiff is a former police officer.

11. He was the only full time white employee teaching in the Dearborn Criminal Justice program.

12. Defendant Kevin Early, Ph.D. was Plaintiff's supervisor.

13. Early created an atmosphere conducive to discrimination and retaliation against the white male Plaintiff, beginning in September 2008 and continuing through the denial of tenure to Plaintiff in May 2014.

14. Early has made the following racist statements to Plaintiff during his employment:

   a. Most police officers are white males and racists;

   b. The people who live in Saline, Michigan are racists and display confederate flags (Plaintiff lives in Saline and has never seen a confederate flag on display there); and

   c. White workers at a McDonalds' restaurant foisted the "perception of white beauty… upon [my] daughter" by giving her daughter a happy meal with a Caucasian doll in it.

15. Early continuously pressured Plaintiff to afford black students special treatment, contrary the Equal Protection Clause of the 14th Amendment to the United States Constitution and Titles IV and VI of the Civil Rights Act of 1964, 42 USC § 2000(e) et seq.

16. On one occasion, two of Plaintiff's students, who were black females, complained that he was unfair in his grading because he penalized them for turning in their term papers late.

17. Plaintiff's policy is that **all** students are penalized for late assignments.

18. Plaintiff refused to change the grades for the two students.

19. The students then appealed to Early, who told Plaintiff: "David, this is Detroit, if even one student claims you are racist or sexist, the hounds will come out of the woodwork."

20. Early has made many wild accusations involving Plaintiff and communicated those accusations to black students, including that Plaintiff:

    a. Violated a student's civil rights;

    b. Tried to harm a student's reputation; and

    c. Accessed a student's credit report and shared it with other faculty and staff; Early advised the student to get an attorney and sue Plaintiff.

21. All of the accusations were blatantly false as Plaintiff has never attempted to harm students or violate their rights.

22. Early's actions were intended to oust Plaintiff because he is a white male and included:

    a. Soliciting black students to file an unfounded lawsuit against Plaintiff by providing them with false information;

    b. Advising the black students what to tell their attorneys and providing one student documents for what he knew to be a frivolous lawsuit;

    c. Misrepresenting to the Dean the "seriousness" of a frivolous lawsuit in order to play the "race card" against Plaintiff through

the Dean; in fact, the lawsuit was determined to be frivolous by U of M's general counsel, who indicated that it had no basis in law or fact.

    e. Improperly editing Plaintiff's comments from faculty meeting minutes;

    f. Secretly changing class prerequisites to make it more difficult for students to register for Plaintiff's classes;

    g. Seeking other instructors to teach Plaintiff's classes;

    h. Secretly posting Plaintiff's job and interviewing candidates for Plaintiff's position in violation of University procedure;

    i. Seeking to limit funding for Plaintiff's expenses;

    j. Assigning Plaintiff extra duties and responsibilities at the time he was preparing for his tenure review;

    k. Prior to the tenure vote, visiting Professors and lobbying them to oppose Plaintiff's application for tenure, falsely claiming that Plaintiff is a racist; and

    l. Falsely telling Plaintiff's colleagues that he was a "terrible "racist.

23. Early told former Dean Jerold Hale that Plaintiff had put himself and Dearborn in "great legal jeopardy," which is false.

24. When Plaintiff opposed his race and gender discrimination Early:

    a. Became outwardly hostile towards Plaintiff;

    b. Attempted to eliminate a summer course Plaintiff was teaching; and

    c. On three occasions, attempted to intimidate Plaintiff by placing Plaintiff in a headlock and stating, "What am I going do with you?"

25. Dean Hale refused to remedy the situation because he was terrified at the prospect of a complaint by a black employee and he noted that the City of Dearborn and University of Michigan Dearborn campus were having difficulty in overcoming perceptions of racism towards blacks.

26. Also during this time, someone tampered with Plaintiff's student evaluations of his teaching, but no investigation was initiated, despite notice of the tampering and Plaintiff's request for an investigation.

27. The false evaluations are still in Plaintiff's file and Defendant has taken no remedial action to purge his file of the tainted evaluations.

28. Defendant's attorney, Elizabeth Hanning, told Plaintiff he should "back off and remain quiet about racism and problems about Early" and suggested that Plaintiff should leave the University if he was unhappy.

29. Early used his position of power to ensure that Defendant was denied tenure.

30. Plaintiff made several formal requests that Early be removed from his tenure committee due to his racist actions and statements.

31. Dean Hale's response was that Plaintiff could appeal his tenure vote "after the fact."

32. There are five levels of tenure voting:

    a.    Initial vote: Discipline Level (i.e. Criminal Justice/Sociology level); the Discipline Level committee voted *in favor* of Plaintiff's tenure;

    b.    Departmental vote: Behavioral Sciences Department Level; the Departmental Level committee voted *in favor* of Plaintiff's tenure;

    c.    Confirmation vote: College Executive Committee; the College Executive Committee *denied* Plaintiff tenure;

    d.    Faculty Senate Tenure *Appeals* Committee vote: the Tenure Appeals Committee voted unanimously to recommend that Plaintiff receive tenure; and

    e.    The entire Faculty Senate Promotion and Tenure Committee unanimously voted to recommend tenure.

33.    Defendant notified Plaintiff that the Executive Committee voted to deny him tenure on November 14, 2013, overruling the two earlier votes.

34.    Dean Marty Hershock, who replaced Hale in 2013, refused to tell Plaintiff the basis for the denial.

35.    Hershock was unconcerned that Plaintiff's tenure denial was based on his race and gender and in retaliation for his opposition to race discrimination even though Dearborn's policies require that its administrators ensure that discrimination or retaliation do not taint the tenure process.

36.    Defendant refused to investigate and/or remediate the race discrimination and retaliation against Plaintiff.

37. During the December 20, 2013 tenure appeal hearing, Dean Hershock requested that the committee not only reject the tenure appeal, but vote for termination of Plaintiff's employment.

38. Informed of the overwhelming evidence of racial and gender discrimination against Plaintiff, the Faculty Senate *Appeals* Committee voted unanimously to recommend that Plaintiff receive tenure.

39. Despite that recommendation, Provost Kate Davey on January 13, 2014 rejected the Faculty Senate *Appeals* Committee recommendation that Plaintiff receive tenure.

40. The entire Senate Faculty Senate Promotion and Tenure Committee on January 20, 2014 voted unanimously to recommend Plaintiff for tenure.

41. Nonetheless Dearborn denied Plaintiff tenure.

## COUNT I
## Race - 42 USC §1981

42. Plaintiff incorporates by reference each of the preceding allegations.

43. Defendant discriminated against Plaintiff because he is a white male.

44. The discrimination denied Plaintiff his right to enter into employment contracts as guaranteed by 42 USC §1981.

45. Specifically, Defendant was instrumental in denying Plaintiff tenure and terminating his employment because of Plaintiff's race.

46. This case should therefore be analyzed under the mixed motive analysis set forth in *White v Baxter,* 533 F3d 381, 400 (6th Cir 2008).

47. Defendant's actions were willful, malicious and/or done with reckless indifference to Plaintiff's rights to be federally protected.

48. Defendant's illegal conduct has caused, and will continue to cause Plaintiff emotional distress, especially outrage, loss of reputation, embarrassment and the physical manifestations of these injuries as well as economic damages.

WHEREFORE Plaintiff requests that this Court enter judgment against Defendant as follows:

    a. Compensatory damages in whatever amount above $75,000.00 he is found to be entitled;

    b. An award of lost wages and the value of fringe benefits, past and future;

    c. An award of exemplary and punitive damages; and

    d. An award of interest, costs and reasonable attorney fees.

### COUNT II
### Retaliation – 42 USC § 1981

49. Plaintiff incorporates by reference the preceding paragraphs.

50. Plaintiff engaged in activity protected by 42 USC §1981 when he reported to Dearborn Defendant's discriminatory conduct undermining his tenure application and his demand that Plaintiff provide educational preferences based on race to the black female students in his class.

51. Defendant interfered with Plaintiff's efforts to achieve tenure because of his protected activity.

52. Because Defendant will no doubt justify its actions by articulating legitimate but pretextual non-retaliatory reasons, this case should be analyzed under the mixed-motive method of proof.

53. Defendant's unlawful retaliation has caused, and will continue to cause Plaintiff emotional distress, especially outrage, loss of reputation, embarrassment and the physical manifestations of these injuries as well as economic damages.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant granting:

   a. a Compensatory damages in whatever amount above $75,000.00 he is found to be entitled;
   b. An award of lost wages and the value of fringe benefits, past and future;
   c. An award of exemplary and punitive damages; and
   d. An award of interest, costs and reasonable attorney fees.

Respectfully submitted,

*/s/ James K. Fett*____
By: James K. Fett
Fett & Fields, P.C.
805 E. Main St.
Pinckney, MI 48169
734-954-0100
jim@fettlaw.com

Dated:  February 6, 2015

(P39461)
Attorneys for Plaintiff

<u>Affidavit of Mailing</u>

I hereby certify that on February 6, 2015, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: **not applicable**, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: **not applicable.**

*/s/ James K. Fett*___
James K. Fett
Fett & Fields, P.C.
805 E. Main St.
Pinckney, MI  48169
734-954-0100
jim@fettlaw.com
(P39461)

## JURY DEMAND

NOW COMES Plaintiff, through his counsel Fett & Fields, P.C., and hereby demands trial by jury in the above-captioned matter.

                                                 Respectfully submitted,

                                                 */s/ James K. Fett*____
                                                 By:  James K. Fett
                                                 Fett & Fields, P.C.
                                                 805 E. Main St.
                                                 Pinckney, MI  48169
                                                 734-954-0100
                                                 jim@fettlaw.com
                                                 (P39461)
Dated:  February 6, 2015          Attorneys for Plaintiff

Affidavit of Mailing

I hereby certify that on February 6, 2015, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:  **not applicable**, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: **not applicable.**

                                               */s/ James K. Fett*___
                                               James K. Fett
                                               Fett & Fields, P.C.
                                               805 E. Main St.
                                               Pinckney, MI  48169
                                               734-954-0100
                                               jim@fettlaw.com
                                               (P39461)